**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ELLMAN AESTHETICS, LLC, and
DAVID ELLMAN MD,

CASE NO.:

Plaintiffs,

v.

BTL INDUSTRIES, INC.,

Defendant.
_______________________________________/

## COMPLAINT

Plaintiffs, ELLMAN AESTHETICS, LLC and DAVID ELLMAN MD, by and through undersigned counsel, sue Defendant, BTL INDUSTRIES, INC., and alleges as follows:[1]

## NATURE OF THE ACTION

1. This is a civil action for unfair and deceptive business practices, antitrust violations, fraud, and negligent misrepresentation.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. Jurisdiction over the state and common law claims is also appropriate under 28 U.S.C. § 1367(a) and principles of pendent jurisdiction.

3. This Court has personal jurisdiction over Defendant and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a). A substantial part of the events or omissions giving rise to the claims in this action occurred in this District and/or Defendants may

---

[1] Plaintiff Ellman Aesthetics, LLC is hereby referred to as "Ellman Aesthetics." Plaintiff David Ellman is hereby referred to as "Dr. Ellman." Ellman Aesthetics and Dr. Ellman is hereby collectively referred to as "Plaintiffs." Defendant BTL Industries, Inc. is hereby referred to as "BTL" or "Defendant."

be found in this district. Further, the agreements between Plaintiffs and BTL that are the subject of this action require the jurisdiction of all disputes "arising out of, or relating to, this Agreement to a court in Boston, Massachusetts." A true and correct copy of the purchase agreements are being filed contemporaneously hereto as Composite Exhibit "A."

**THE PARTIES**

4. Ellman Aesthetics is a limited liability company registered in the State of Florida, with a principal place of business at 9970 Central Park Blvd., #301, Boca Raton, FL 33428, solely with members that are citizens of the State of Florida.

5. Dr. Ellman is a Florida citizen residing in Palm Beach County, Florida.

6. Defendant BTL is a corporation of the State of Massachusetts, with a with a principal place of business at 362 Elm Street, Marlborough, MA 01752.

**FACTUAL ALLEGATIONS**

7. BTL is a privately owned developer and manufacturer of Emsculpt®, Emsculpt NEO®, and Emsella® body-contouring and/or skin-tightening products.

8. BTL's Emsculpt® utilizes its proprietary high intensity focused electromagnetic energy (HIFEM®), which introduced an entirely new category of muscle toning and muscle strengthening to the aesthetic industry.

9. BTL's Emsculpt NEO® combines BTL's HIFEM® and radiofrequency technology to tone muscle and break down fat.

10. BTL's Emsella® uses BTL's HIFEM® technology, inducing thousands of kegel-like pelvic floor muscle contractions in a single session. These contractions re-educate and strengthen weak pelvic floor muscles, restoring neuromuscular control and improving urinary incontinence in both men and women.

11. BTL engages in the sale of its Emsculpt NEO® and Emsella® and heavily solicited Dr. Ellman as a potential purchaser of the equipment as Dr. Ellman has a well-established OB/GYN medical practice in Boca Raton, Florida, Women's Healthcare of Boca Raton.

12. Under information and belief, BTL intentionally targets and solicits business owners that are unsophisticated in the industry of body contouring and skin tightening so that they are unfamiliar with the market and what price the treatment sessions for their product bring in the market, and they have no way of confirming.

13. Under information and belief, BTL has conspired with MMP Capital, a financing company, and Spark Marketing, a marketing company, to create an illusion that these unsophisticated business owners are investing in a program with minimal to no risk.

14. BTL sells these business owners extremely expensive equipment promising great returns and a booming market knowing that in reality there is no market for services using BTL's equipment at BTL's required minimum advertised prices.

15. BTL teams up with MMP Capital to provide these business owners with boilerplate Equipment Finance Agreements implying that these business owners may only finance the equipment with MMP Capital and making these business owners believe that the finance agreements were mandatory and not subject to negotiation. BTL misrepresents the interest rates for the financing and lies to these business owners that their personal credit would not be affected by the equipment financing and no personal assets would be subject to the collection if a default occurred on the financing. These lies are made to further induce the business owners to purchase the BTL equipment and enter into an Equipment Finance Agreement.

16. BTL sells its equipment to these business owners by assuring that there is a market full of customers waiting for them to begin selling services with BTL products. BTL introduces

these business owners to Spark Marketing to help bring customers in their doors and includes a co-op marketing program in its purchase contracts. Spark Marketing works with BTL to support BTL's lies of a booming market, marketing, and endless customers, yet provide little to no customers to these business owners.

17. At the end of February 2023, Dr. Ellman was approached by BTL representative, Kris Huston, about purchasing BTL equipment. To induce Dr. Ellman's purchase, BTL knowingly and intentionally misled and lied to Dr. Ellman about the profitability and existence of a market to sell services with BTL's products at BTL's minimum advertised prices. At the meeting on March 2, 2023, BTL made the following misrepresentations to Dr. Ellman to induce him to purchase their equipment that under information and belief, are knowingly false statements:

a. Dr. Ellman would be one of 6 ambassador sites that BTL will actively support and promote;

b. If Dr. Ellman was to be an ambassador, Dr. Ellman would need to purchase not one, but two machines;

c. Dr. Ellman would make a million dollars a year in an all-cash business with national advertising campaign that BTL would launch;

d. Rob Gronkowski and Kim Kardashian would be the pitch person celebrities for the national advertising campaign;

e. The "BTL plan" could not fail if Dr. Ellman does what BTL says to do and "it will be a success";

f. No one could afford to pay the machines in total;

g. To break even, Dr. Ellman would only need to make two sales using the Emsculpt NEO and two sales using the Emsella®;

h. Dr. Ellman would be bringing in so much money that he would need to incentivize his staff with a percentage of the profits;

i. There would be only six ambassadors throughout the southeast region with two in Florida and one in Puerto Rico;

j. The Emsculpt NEO® was going to replace cool sculpting;

k. Dr. Ellman would get $1000 per treatment with the Emsculpt NEO®;

l. Dr. Ellman would get $400 per treatment with the Emsella®;

m. Dr. Ellman was leasing the equipment because no one could afford to pay for the cost of the machines;

n. If Dr. Ellman was not successful after 6 months, he could stop paying and they would just come take back the equipment;

o. Dr. Ellman will be flooded with business;

p. Dr. Ellman would easily break even each month by just selling 2 sessions of the Emsculpt NEO® and 2 sessions of the Emsella®;

q. Dr. Ellman and BTL would be doing business together since he was going to be an ambassador;

r. In order to be successful, Dr. Ellman would need to purchase a separate telephone line for marketing calls and would need to answer the calls within 14 minutes;

18. On March 2, 2023, the BTL representative provided Dr. Ellman with a boilerplate Equipment Finance Agreements for MMP Capital. The BTL representative advised Dr. Ellman that he was leasing the equipment, he advised Dr. Ellman of the monthly payment, and the lease term. Dr. Ellman was never informed that he was actually purchasing and financing the equipment and in fact, was led to believe otherwise. He also was never told that there was an interest rate or

that he was even paying interest.

19. Further, the boilerplate Equipment Finance Agreements presented to Dr. Ellman do not disclose or state any interest rate. The BTL representative advised Dr. Ellman that he could return the equipment if servicing BTL products does not work out with no penalty, but this was not true. These false statements were made purely to induce Dr. Ellman to enter into the equipment financing agreement with MMP by giving Dr. Ellman a false sense of security that there was no downside making the investment to lease the equipment.

20. On March 2, 2023, as a result of fraudulent misrepresentations by BTL in the sale of the equipment, Dr. Ellman, as a representative of Women's Healthcare of Boca Raton, contracted with BTL to purchase the Emsculpt NEO® and Emsella®. A copy of the Emsculpt NEO® and Emsella® Purchase Contracts are attached hereto as Composite Exhibit "A." At the same time, Dr. Ellman executed an Equipment Finance Agreement in connection with the Emsculpt NEO® as it was understood by Dr. Ellman that he could not purchase the BTL equipment and had to lease the equipment through MMP Capital.

21. On or about March 21, 2025, Women's Healthcare of Boca Raton assigned all rights under the Emsculpt NEO® and Emsella® Purchase Contract and Equipment Finance Agreement to Ellman Aesthetics.

22. The total purchase price of all BTL equipment purchased by Dr. Ellman is approximately $530,580.00.

23. Prior to or at the time of the execution of the contracts, BTL also advised Dr. Ellman that he would be assigned a success manager who would assist him in ensuring that the acquiring of the BTL equipment was a success. Sometime after the BTL equipment was delivered, Dr. Ellman was assigned a BTL success manager named Sarah Hayden. Sara Hayden

informed Dr. Ellman that the Emsculpt NEO® would bring $850 per treatment and not $1000 per treatment as was misrepresented by BTL to induce Dr. Ellman to acquire the equipment. In addition, Sarah Hayden did little to assist in the success of selling the BTL equipment but did pitch and try to sell Dr. Ellman another piece of BTL equipment, the EMFACE®.

24. Under information and belief, the success manager's job, as told by BTL, is to try and sell the customer more equipment and is paid commission to do so. As such, the customer is led to believe that BTL is going to help them to market and sell the services provided by the equipment, but they are really just trying to get the customer to purchase more equipment while they are still under the falsehood that this equipment is going to lead to a highly profitable business.

25. In addition to the cost of the equipment, Plaintiffs further invested in excess of $120,000.00 in staffing, training, marketing, and business development to operate the new body sculpting business as sold to them by BTL's fraudulent misrepresentations.

26. The Emsculpt NEO® contract included a Retail Price Maintenance ("RPM") price restraint agreement with a minimum advertised price ("MAP") consumer pricing schedule. The RPM consumer retail price was $850.00 per Emsculpt Neo treatment/session and under information and belief, is uniformly mandated and applied throughout all U.S. markets by BTL.

27. The provider automatically becomes a party to the RPM agreement when it purchases the Emsculpt Neo and other non-invasive body sculpting equipment from BTL; it is not a choice and the customer is penalized by BTL if they advertise a lower price. The BTL purchase agreement includes the following RPM language:

**Minimum Advertised Pricing Policy.** If Customer participates in Emsculpt NEO® MAP (minimum advertised pricing of $850/ treatment) , Emsculpt MAP (minimum advertised pricing of $750/treatment), and Emface® MAP (minimum advertised pricing of $1000/treatment), BTL will offer the following benefits:

(1) include Customer in BTL's provider directory,
(2) 2nd and 3rd year warranty service coverage at no charge (annual value of $15,000) on the Emsculpt, Emsculpt NEO or Emface device (excluding consumables and replacement parts)
(3) discount from list price for replacement applicators (from $30,000 to $10,000 per pair of Emsculpt applicators, from $30,000 to $15,000 per pair of Emsculpt NEO applicators, and from $3,200 to $1,600 per 20-piece box of forehead single-use applicators or 40-piece box of cheek single-use applicators.

BTL will provide Customer with a written notice for the first non-compliance with MAP, and a second infraction will result in loss of benefits. Examples of non-compliance to MAP policy include representing over the phone, promoting, or publishing:

- Treatments at a price below the MAP
- "Buy one, get one" offers
- Package offers averaging out to less than MAP
- Statements such as or similar to "we will beat any price" or "guaranteed lowest pricing anywhere"
- Participating in social coupons and discount sites

Any modification to the MAP policy must be in writing by BTL. BTL sales employees or independent contractors do not have the authority to modify or grant exceptions to this policy. BTL reserves the right to adjust the MAP at its sole discretion at any time. BTL may also designate promotional periods during which the policy terms change.

28. BTL body sculpting equipment purchases (RPM and non-RPM governed equipment) may routinely exceed $500,000, often exceeding $1 million, including financing costs.

29. The provider uses the equipment to provide body sculpting services to consumers. The RPM agreement governs the minimum retail price of the services the provider may advertise to consumers. In the case of the Emsculpt NEO®, the provider may not advertise below $850 per treatment session (with a BTL recommended 4-treatment minimum of $3,400). BTL maintains similar RPM agreements for other equipment it sells to providers.

30. To operate the equipment, the provider must regularly purchase expensive consumables from BTL, a potential indirect royalty. If a provider violates the RPM agreement, BTL doubles the cost of the applicators needed to run the machine from $15,000 to $30,000 and removes the provider from the BTL online Provider List, making profitability with the equipment highly unlikely. In addition, the consumable regime misleads BTL equipment buyers that providers may exit the RPM agreement and maintain the profitability of their investment.

31. Providers seeking to sell BTL equipment and exit their investment are unable to do so because BTL requires that the customer not sell the equipment to a third party unless such party has been trained and certified by BTL to us the equipment, and the new owner must pay BTL an approximate $100,000 arbitrary recertification/transfer fee. The BTL agreements here do not mention such a transfer fee, which is a material omission. The transfer fee makes reselling and exiting the equipment investment virtually impossible and misinforms the buyer regarding BTL assurance to market its products and police its market.

32. As a result of the RPM contractual provision, BTL maintains a perpetual security interest in the equipment to ensure the provider's performance of its obligations as BTL requires the recertification fee, will prevent the machine from working, doubles the cost of the applicators, and removes the provider from the BTL website. The security interest makes reselling and exiting the investment in the equipment virtually impossible, and it misinforms the buyer regarding BTL assurance to market its products and police its market.

33. BTL includes a coercive punishment procedure for RPM violators and providers seeking to exit the RPM agreement that damages the provider's investment in RPM-governed and non-RPM-governed equipment investments.

34. BTL used misleading and deceptive business investment language and equipment income presentations to induce the initial purchase of BTL equipment and subsequent equipment purchases by Plaintiffs at BTL provider conferences where BTL upsells the business investment opportunity of using BTL equipment, thereby targeting Plaintiffs and providers to purchase additional (expensive) BTL equipment.

35. BTL induced Dr. Ellman by showing a spreadsheet showing the income that would be realized by Dr. Ellman in using the BTL Emsculpt NEO. BTL told Dr. Ellman that calculating

the minimum advertised price of $850 per treatment/session and the number of customers per day is how much money they will earn, pointing to the spreadsheet. The earnings representations made by BTL were significant to Dr. Ellman and fraudulently induced them him purchasing the equipment.

36. BTL provided false and misleading information to Dr. Ellman to make him believe that there was a market for the services provided by their machines when in fact, BTL knew that no such market exists and that virtually none of their retailers were able to sell the services for the minimum-RPM of $850 per session or even $200 per session for that matter. Further, BTL significantly inflated the price of the machines based upon this false market that it created.

37. Under information and belief, BTL has made similar misrepresentations to other purchasers to induce them to buy their equipment, and those other purchaser are unable to sell the services for the MAP required by BTL or even for much less.

38. <u>Price Discrimination.</u> The BTL RPM is a vertical price-fixing system that favors body sculpting businesses with preexisting customer flows (before becoming a BTL provider), allowing such companies to sell the RPM-governed services below the MAP. At the same time, new market entrant BTL providers cannot advertise below $850 per session with the required 4-session minimum of $3,400. The BTL price restraint creates price discrimination with demonstrable cost of operations differentials between BTL providers, delivering favored providers, i.e., providers with preexisting customer flows, lower customer acquisition costs, and improved operations margins, freeing them to spend more on advertising and marketing and offer other high- valued and more diverse service offerings. These advantages increase the profitability of favored BTL providers over non-favored BTL providers and effectively reduce competition among BTL vertical providers and horizontal competition as discriminated providers leave the

market.

39. Consumables. Instead of ceasing business with an RPM-violating provider, BTL increases the equipment consumable cost by 100%, thereby punishing the provider by directly increasing the provider's cost basis of operating the equipment. Increasing a provider's consumable costs is a coercive act designed to enforce the BTL price restraint provision; however, the price restraint renders the targeted provider unprofitable and destroys the provider's significant investment in BTL equipment, which may exceed $1 million. Many vertical BTL providers use competitor equipment to provide health and beauty services, including body sculpting, and compete horizontally with BTL providers and non-BTL providers. Unprofitable BTL providers leaving the market result in a less competitive horizontal market and shrinking consumer choice.

40. Transfer Fee. Providers seeking to exit the RPM by selling their equipment must pay BTL a $100,000 recertification/transfer fee. The BTL agreement mentions the fee, but the amount is not specified, a material omission. The transfer fee is a coercive attempt to enforce the RPM by rendering the selling and exiting of the RPM-governed investment virtually impossible, causing the provider to suffer continued losses or incur a catastrophic loss. In addition, the transfer fee informs buyers that BTL will police its market to ensure RPM compliance and stop the emergence of a secondary equipment market that may undercut RPM-governed providers. However, BTL does not enforce this provision and has permitted a secondary equipment market to emerge. In addition, though BTL does not enforce the recertification/transfer fee, the recertification/transfer fee deters providers from selling their BTL equipment and exiting their investment, which results in providers suffering continued and ongoing losses.

41. Coercive Non-Price Restraints. BTL uses the aforementioned non-price restraints to punish RPM-offending providers and non-offending providers seeking to exit the RPM agreement.

In addition, BTL extends its non-price coercion to non-RPM-governed equipment. In the event of an RPM violation or a provider exiting the RPM agreement, as is the case with the Plaintiff, BTL coercively removes the provider entirely from BTL's national Provider List verification system, notwithstanding that the provider may own or have invested in non-RPM-governed BTL body sculpting equipment. The Provider List is an online service operated by BTL that allows consumers to validate a provider's ownership of BTL equipment (RPM and non-RPM-governed equipment) and select a BTL provider to provide the consumer's desired body sculpting services. BTL removes or delists a provider from the validation system for an RPM violation or simply exiting the RPM agreement, thereby rendering the provider invisible to consumers, notwithstanding the provider having invested $1± million in BTL RPM and non-RPM- governed equipment. Delisting shuts the provider out of the body sculpting market and destroys its investment in RPM-governed and non-RPM-governed equipment, reducing vertical and horizontal competition and consumer choice. This was done to Plaintiffs by BTL.

42. BTL's Perpetual Security Interest. To ensure buyer compliance with all provisions of the agreement and RPM, the buyer grants BTL a perpetual security interest in the equipment to secure the "performance by the Customer of its liabilities and obligations." The perpetual security interest presents and informs buyers that BTL will police its market to ensure RPM compliance, impose recertification/transfer fees, and stop the emergence of a secondary equipment market that may undercut RPM-governed providers. BTL does not enforce this provision, as evidenced by the emergence of a secondary market for BTL equipment whereby buyers may purchase BTL equipment at astronomical discounts; for example, 75% - 90% off the original equipment price is common in the secondary BTL equipment market. By not enforcing its security interest in the equipment and policing its market, BTL allows two distribution models to exist, whereby vertically

price-restrained RPM providers compete horizontally with secondary market non-price-restrained BTL equipment owners, where the cost basis and operational expense are a fraction of the RPM-governed providers. Such horizontal competition with identical but non-price-restrained BTL equipment owners reduces or destroys the profitability of price-restrained BTL providers, resulting in providers leaving the market, diminished horizontal competition and consumer choice, and increased consumer prices within the body sculpting market and related services. In addition, though BTL does not enforce the security interest, the security interest deters providers from selling their BTL equipment and exiting their investment, which results in providers suffering continued and ongoing losses.

43. Restricted Marketplace. BTL coercions and RPM vertical price restraint result in providers losing the freedom to reject the RPM without suffering massive economic loss. The BTL RPM provision (i) precludes providers from freely acquiring other competitive goods to the price-fixed goods, (ii) precludes providers from selling off their equipment/inventory, (iii) generates a manufacturer (BTL) driven cartel where providers have no freedom to select another manufacturer or alternative consumable devices and services to deliver to consumers, (iv) misinforms the provider regarding expected revenue and equipment profitability, causing devastating harm to the provider and its ability to serve the market, and (v) advantages select providers through price and non-price restraints. Providers with existing body sculpting customer flows may sell RPM-governed services at a low, market-realistic price. In contrast, providers without existing body sculpting customers may only advertise for customers at the BTL governed $850/$3,400 minimum package price for which there is little to no market. BTL is aware that their RPM regime results in a majority of their providers losing money on their BTL investment, with many going out of business and leaving the market.

44. Fraud. BTL integrated a minimum price RPM into its sales process to purposefully and fraudulently induce potential customers (providers) into purchasing BTL Emsculpt Neo equipment at inflated and unrealistic prices. Under information and belief, BTL knew there was little to no market for the services provided by the equipment; consequently, the vast majority of BTL providers lost their investment in RPM-governed equipment. The BTL sales process utilizes the stated RPM minimum advertised price ($850 per session/$3,400 4-session minimum) to (1) make an indirect earnings claim that misleads buyers regarding the business prospects of their BTL investment, (2) indicate and misinform buyers that a sufficiently large market exists for the Emsculpt Neo equipment at the RPM-governed service price, and (3) indicate and misinform buyers that RPM service price is a luxury sale notwithstanding BTL flooding the market with its RPM-governed equipment without accompanying RPM pricing adjustments to account for the increased number of in- market providers all competing for the same customer base.

45. BTL Conferences. After purchasing a BTL device, BTL invites the provider to attend BTL-sponsored conferences where BTL sells additional (costly) equipment to the provider. At these conferences, BTL removes all pretense regarding promoting its business opportunity. "Build Your Aesthetic Empire" conference headliners and BTL featured speakers, that are typically doctors paid by BTL, promoting the revenue opportunities available with further investment in BTL equipment was customary.

46. BTL introduced Plaintiffs to a third-party “reliable” marketing agency at the conference, Spark Marketing. Spark Marketing told Plaintiffs it had extensive experience successfully marketing to Emsculpt NEO consumers and schemed with BTL to present Plaintiffs with the illusion of guaranteed profit and customers. Spark Marketing’s statements reinforced the enormous opportunity of investing in BTL equipment.

47. On or about March 22, 2023, Plaintiffs entered into contract with Spark Marketing, hiring Spark Marketing to provide customers, as recommended by BTL and spent approximately $60,000.00. A true and correct copy of the Spark Marketing Contract is attached hereto as Exhibit “B.” Spark Marketing produced no customers for Plaintiffs. However, due to Spark Marketing’s lack of production of any customers, Plaintiffs were forced to spend an additional $120,000.00 in marketing efforts.

48. BTL Actively Screened Objective Questioning. BTL prevented providers, including Plaintiffs, from attending BTL conferences with potentially damaging questions about the BTL business sales process and the actual market size for RPM-governed services.

49. BTL knowingly utilized its RPM vertical price restraint to obtain an unlawful objective, promote investment in costly body sculpting equipment and business,

a. as a disguised earnings claim to rationalize the purchase of overpriced equipment;

b. to mislead and misinform providers regarding the economic prospects for revenue and profitability of the proposed investment;

c. to falsely establish a market for the service of the equipment;

d. to inflate the market price for the service of the equipment;

e. to unlawfully coerce buyers to uphold the RPM;

f. to harmfully intervene in buyers' ability to perform due diligence; and

g. to promote the sale of an unregistered business opportunity.

50. BTL knowingly set the RPM outside the known universe for its RPM- governed service for which no demonstrable market exists in the U.S., which resulted in catastrophic economic harm to Plaintiffs and other BTL equipment owners.

51. BTL was aware that its RPM regime would not provide sufficient profitability to

providers such that the provider may offer additional desirable services, including services that compete with BTL equipment services.

52. BTL was aware that provider profitability was negatively impacted by its flooding the market with RPM-governed equipment.

53. BTL attempted to secure adherence to its RPM by means that go beyond mere declination to sell to providers.

54. BTL used price and non-price restraints to unlawfully coerce providers from exiting the RPM agreement, causing tremendous economic damage to providers.

55. BTL used an undisclosed $100,000 recertification/transfer fee to unlawfully coerce acquiescence to the RPM agreement and otherwise coerce providers from selling off their investment in RPM-governed equipment, causing tremendous economic damage to providers.

56. BTL used the RPM to unlawfully coerce providers to maintain participation in a money-losing BTL investment and service.

57. BTL used the RPM to prevent providers from effectively communicating any price below the mandated minimum price to potential customers through both restraints on advertising and restraints on direct communication with customers.

58. BTL knowingly included material omissions in its RPM agreement designed to mislead providers.

59. BTL knowingly sold the same RPM-governed equipment to preexisting body sculpting businesses with large customer flows and to non-body sculpting businesses. As configured, the minimum advertised RPM delivered considerable market advantages to select providers while harming other providers.

60. BTL knowingly generated an anticompetitive regime that inflates consumer

service pricing and harms consumer availability amongst other vertical and horizontal competition.

61. BTL knowingly generated an alternative, horizontal competitive distribution model unknown to providers that harmed RPM-governed providers and reduced market competition.

62. BTL knowingly sold the equipment at a highly inflated price and rationalized the inflated price to potential buyers by fraudulently representing to the buyers that the MAP represented the market price that the equipment would bring to the buyer per session.

63. BTL's actions, unfair and deceptive statements, and misrepresentations are false, misleading, defamatory, unfair and deceptive and were calculated to deceive, and as a result, they have caused Plaintiffs to sustain serious injury and damages to its business reputation and operations.

**COUNT I – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against BTL)**

64. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-63 as incorporated herein.

65. At all relevant times, BTL was engaged in trade or commerce within the meaning of Fla. Stat. § 501.203(8).

66. BTL's actions described above constitute unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of and in violation of Fla. Stat. § 501.204

67. Under information and belief, BTL's actions described above have at all times relevant to this action been willful and/or knowing.

68. Pursuant to Fla. Stat. § 501.204, as a direct and proximate result of BTL's actions alleged above, Plaintiffs have suffered monetary damages.

**COUNT II – VIOLATION OF ROBINSON-PATMAN ACT**
**(Against BTL)**

69. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-68 as incorporated herein.

70. To operate BTL's equipment, the provider must regularly purchase expensive consumables from BTL. If a provider violates the RPM agreement, BTL doubles the cost of consumables and removes the provider from the BTL online Provider List, making profitability with the equipment highly unlikely.

71. Instead of ceasing business with an RPM-violating provider, BTL increases the equipment consumable cost by 100%, thereby punishing the provider by directly increasing the provider's cost basis of operating the equipment. Increasing a provider's consumable costs is a coercive act designed to enforce the BTL price restraint regime; however, the price restraint renders the targeted provider unprofitable and destroys the provider's significant investment in BTL equipment, which may exceed $1 million. Many BTL providers use competitor equipment to provide health and beauty services, including body sculpting, and compete horizontally with BTL providers and non-BTL providers. Unprofitable BTL providers leaving the market result in a less competitive horizontal market and shrinking consumer choice.

72. As a consequence of said conduct by BTL as aforesaid, Plaintiffs were injured in business or property as Plaintiffs' ability to successfully operate the equipment business sold by BTL and was restrained and/or impaired because Plaintiffs are unable to compete in the marketplace and generate business, has been coerced and punished by BTL and has suffered and been damaged financially.

73. BTL's conduct as aforesaid is continuous in nature and has continued to the date hereof.

**COUNT III – NEGLIGENT MISREPRESENTATION**
**(Against BTL)**

74. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-73 as incorporated herein.

75. On or about March 2, 2023, BTL made several misrepresentations of material facts to Plaintiffs regarding the marketability and profitability of its equipment.

76. At the time BTL made these representations to Plaintiffs, BTL should have known these representations were false.

77. BTL made these representations to Plaintiffs with the intent to induce Plaintiffs to rely on the representations and to induce Plaintiffs to purchase the BTL equipment.

78. Plaintiffs justifiably relied upon these misrepresentations.

79. As a direct result, Plaintiffs have been injured.

**COUNT IV – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2**
**(Against BTL)**

80. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-79 as incorporated herein.

81. BTL manufactures and sells the body-contouring and/or skin tightening equipment. BTL is the only manufacturer of these particular types of machines as it holds the only patents on the specific type of technology used in these machines.

82. BTL misrepresented to Plaintiffs that a market existed for the services provided by the equipment they sold him at $850 per session or $750 per session depending on the piece of equipment being used. They made many fraudulent misrepresentations that induced Plaintiffs to purchase the equipment, which statements were used to make Plaintiffs believe that if they

purchased the equipment, they would be able to pay for the equipment and sustain a business based upon selling the body contouring treatments/sessions at $850 per session or $750 per session.

83. As a result, Plaintiffs and BTL entered into the subject Agreement where Plaintiffs could not advertise or communicate a price to any prospective purchaser for less than $850 per treatment session. After some time, it became clear that there was no market for this treatment at this required MAP.

84. Unbeknownst to Plaintiffs at the time of purchase, BTL has contracted with other retailers for the same equipment at lower prices with lower MAPs and allows retailers who have an already substantiated business to sell the treatments sessions to existing customers for less than the MAP.

85. Yet, BTL deemed Plaintiffs to be participating in the MAP by virtue of purchasing the equipment, and when Plaintiffs could not sell the body sculpting treatments at $850 per session, as there is no market for these treatments at such as price for new retailers trying to enter the market, and tried to sell them for a lower price, BTL embarked on a rampage of defamatory and punitive action against Plaintiffs and their businesses.

86. BTL's contract with Plaintiffs, specifically its required minimum advertised price for the body sculpting treatments substantially lessened competition as it completed destroyed any possible competition in the market. It is an unreasonable restraint on trade under Section 1 of the Act.

87. As a consequence of said conduct by BTL as aforesaid, Plaintiffs were injured in business or property as Plaintiffs' ability to successfully operate the equipment business sold by BTL and was restrained and/or impaired because Plaintiffs are unable to compete in the

marketplace and generate business, has been coerced and punished by BTL and has suffered and been damaged financially.

88. Further, under Section 2 of the Act, BTL is a monopoly distributor in this market, which is the market to provide treatment sessions through the use of its equipment. BTL's equipment uses patented technology that only BTL possesses and therefore, BTL is the sole distributor of this type of equipment.

89. As a result of BTL's monopolization, it completely controls the prices that Plaintiffs and other retailers are able to sell the treatment sessions for. BTL knows that the market does not support the MAP it includes in its contracts, and does so, to inflate the price BTL sells the equipment to retailers for. There is virtually no market for these treatment sessions even at prices being offered in the secondary market, and therefore, no competition. As such, these actions by BTL are anticompetitive and Plaintiffs have been directly harmed because it is unable to enter the market as no such market exists.

90. BTL's conduct as aforesaid is continuous in nature and has continued to the date hereof.

**COUNT V – FRAUD**
**(Against BTL)**

91. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-90 as incorporated herein.

92. On March 2, 2023, BTL made the following misrepresentations to Plaintiffs to induce them to purchase its equipment:

a. Dr. Ellman would be one of 6 ambassador sites that BTL will actively support and promote;

b. If Dr. Ellman was to be an ambassador, Dr. Ellman would need to purchase not

one, but two machines;

c. Dr. Ellman would make a million dollars a year in an all-cash business with national advertising campaign that BTL would launch;

d. Rob Gronkowski and Kim Kardashian would be the pitch person celebrities for the national advertising campaign;

e. The "BTL plan" could not fail if Dr. Ellman does what BTL says to do and "it will be a success";

f. No one could afford to pay the machines in total;

g. To break even, Dr. Ellman would only need to make two sales using the Emsculpt NEO and two sales using the Emsella®;

h. Dr. Ellman would be bringing in so much money that he would need to incentivize his staff with a percentage of the profits;

i. There would be only six ambassadors throughout the southeast region with two in Florida and one in Puerto Rico;

j. The Emsculpt NEO® was going to replace cool sculpting;

k. Dr. Ellman would get $1000 per treatment with the Emsculpt NEO®;

l. Dr. Ellman would get $400 per treatment with the Emsella®;

m. Dr. Ellman was leasing the equipment because no one could afford to pay for the cost of the machines;

n. If Dr. Ellman was not successful after 6 months, he could stop paying and they would just come take back the equipment;

o. Dr. Ellman will be flooded with business;

p. Dr. Ellman would easily break even each month by just selling 2 sessions of the

Emsculpt NEO® and 2 sessions of the Emsella®;

q. Dr. Ellman and BTL would be doing business together since he was going to be an ambassador;

r. In order to be successful, Dr. Ellman would need to purchase a separate telephone line for marketing calls and would need to answer the calls within 14 minutes;

93. BTL knew or should have known the representations were false or were made with reckless disregard for their truth or falsity.

94. The representations were made to induce action by the Plaintiffs.

95. Plaintiffs did act to their detriment and as a result sustained damages herein complained of.

96. Also, on March 2, 2023, BTL provided Dr. Ellman with a boilerplate Equipment Finance Agreements for MMP Capital. The BTL representative advised Dr. Ellman that he was leasing the equipment, he advised Dr. Ellman of the monthly payment, and the lease term. Dr. Ellman was never informed that he was actually purchasing and financing the equipment and in fact, was led to believe otherwise. He also was never told that there was an interest rate or that he was even paying interest.

97. Further, the boilerplate Equipment Finance Agreements presented to Dr. Ellman do not disclose or state any interest rate. BTL advised Dr. Ellman that he could return the equipment if servicing BTL products does not work out with no penalty, but this was not true.

98. These false statements were made purely to induce Dr. Ellman to enter into the equipment financing agreement with MMP by giving Dr. Ellman a false sense of security that there was no downside making the investment to lease the equipment.

99. BTL failed to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak in order to induce the Plaintiffs to act to their detriment.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter judgment in its favor on each and every claim for relief set forth above and award them relief, including but not limited to the following:

A. Compensatory damages;
B. Consequential damages;
C. Treble damages;
D. Injunctive relief;
E. Attorney fees, pursuant to Fla. Stat. § 501.2105 and 15 U.S. Code § 15;
F. Pre and post-judgment interest; and
G. Any other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable by right.

Dated May 7, 2026

/s/ Marian A. Kornilowicz
Marian A. Kornilowicz (BBO# 277680)
COHEN, SEGLIAS PALLAS,
GREENHALL & FURMAN, P.C.
1600 Market St., 32nd Floor
Philadelphia, PA 19103
Tel.: 215-564-1700
mak@cohenseglias.com

/s/ Ariane Wolinsky
Gary N. Mansfield (*PHV pending*)
David Stone (*PHV pending*)
Ariane Wolinsky (*PHV pending*)
MANSFIELD BRONSTEIN & STONE, LLP
200 E. Broward Blvd., Suite 1250
Fort Lauderdale, FL 33301
Tel: 954-601-5600
litigation@mblawpa.com

*Attorneys for Plaintiffs*