**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ELLMAN AESTHETICS, LLC, and DAVID ELLMAN MD,

Plaintiffs,

v.

BTL INDUSTRIES, INC.,

Defendant.

CASE NO.: **1:26−CV−12084−LTS**

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs, ELLMAN AESTHETICS, LLC and DAVID ELLMAN MD (collectively, "Plaintiffs"), by and through undersigned counsel, pursuant to Local Rule 7.1(b)(2) and the Court's order extending Plaintiffs' deadline to respond to October 22, 2026 [Dkt. 54], hereby file this Opposition to Defendant BTL Industries, Inc.'s ("BTL") Motion to Dismiss Plaintiffs' Second Amended Complaint and state as follows:[1]

## INTRODUCTION

BTL's Motion to Dismiss should be denied because it fundamentally mischaracterizes both the allegations of the Second Amended Complaint ("SAC") and the governing pleading standards under Rules 8, 9(b), and 12(b)(6). BTL attempts to portray this case as nothing more than a disappointed purchaser seeking to recover losses from an unsuccessful business venture. The SAC alleges far more. Specifically, Plaintiffs allege that BTL induced Dr. David Ellman, and thereafter

[1] Plaintiff Ellman Aesthetics, LLC is referred to herein as "Ellman Aesthetics." Plaintiff David Ellman, M.D. is referred to herein as "Dr. Ellman." Ellman Aesthetics and Dr. Ellman are collectively referred to as "Plaintiffs." Defendant BTL Industries, Inc. is referred to herein as "BTL" or "Defendant."

Ellman Aesthetics, LLC, as assignee of the purchase and financing agreements, to purchase more than $530,000.00 in proprietary aesthetic-treatment equipment through a series of material misrepresentations concerning expected revenues, profitability, patient demand, marketing support, return on investment, and the overall viability of the business opportunity BTL was marketing. Plaintiffs further allege that BTL represented, among other things, that Dr. Ellman would generate approximately $1 million annually from the devices, would be one of only six "Ambassador" sites BTL would actively support and promote, would receive $1,000.00 per Ensculpt® NEO treatment, would rapidly recover his investment through patient demand generated by BTL's marketing programs, and faced minimal financial risk because the equipment could be returned if the venture did not succeed.

The SAC further alleges that these representations were not isolated sales pitches regarding the purchase of medical equipment. Rather, BTL marketed and sold an integrated business opportunity consisting of proprietary devices, financing arrangements, profitability projections, marketing services, patient-acquisition programs, and Spark Marketing lead-generation services designed to induce Plaintiffs to enter the transaction. Plaintiffs allege that BTL possessed superior knowledge concerning provider performance, patient demand, profitability, and the effectiveness of the promised marketing programs, yet failed to disclose material facts, including an approximately $100,000.00 recertification/transfer fee that makes exit from the investment virtually impossible, while promoting the investment as a highly profitable and low-risk opportunity.

Rather than accepting these well-pleaded allegations as true, as required at the motion-to-dismiss stage, BTL asks the Court to resolve factual disputes, draw inferences against Plaintiffs, discount specific factual representations as mere puffery, and impose evidentiary burdens that are

appropriate only after discovery. The SAC satisfies Rules 12(b)(6) and 9(b): it identifies who made each challenged representation, what was said, when, how Plaintiffs relied, and the resulting damages. BTL also asks the Court to treat rulings on a different complaint in *Mark Breiner DDS, LLC v. BTL Industries, Inc.*, No. 1:24-cv-12413-FDS, as dispositive here, but by BTL's own account Breiner sustained part of the fraud claim on materially similar allegations. Accordingly, BTL's Motion should be denied in its entirety. In the alternative, Plaintiffs request leave to amend.

## LEGAL STANDARD

In order to withstand a motion to dismiss, the complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007). "The complaint must set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Turnley v. Banc of Am. Inv. Servs., Inc.,* 576 F. Supp. 2d 204, 211 (D. Mass. 2008) (quoting *Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 19 (1st Cir. 2003)). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

Allegations of fraud must be stated with particularity, which in this Circuit means the complaint must "specify the who, what, where, and when of the allegedly false or fraudulent representation*." Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). Rule 9(b) does not, however, displace the requirement that well-pleaded facts be accepted as true and all reasonable inferences drawn in Plaintiffs' favor.

## ARGUMENT

### I. Plaintiffs' FDUTPA Claim is Not Contractually Barred.

Defendant incorrectly argues that Plaintiffs' claim for violation of Florida's Deceptive and Unfair Trade Practices Act is barred by a contractual choice-of-law provision. The contractual provision relied upon by BTL merely states that the agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." Notably, the provision does not state that all disputes between the parties are governed exclusively by Massachusetts law. The broader "arising out of, or relating to", language on which BTL relies appears only in the separate forum-selection sentence, which addresses where disputes are heard, not which law governs them. SAC Ex. A at 3. Plaintiffs' FDUTPA claim is predicated on duties that exist independent of the Purchase Agreement and would exist regardless of whether the Agreement had ever been executed.

In *Kleiner v. Cengage Learning Holdings II, Inc.*, 66 F.4th 28 (1st Cir. 2023), the First Circuit addressed materially similar contractual language providing that an agreement "shall be construed and governed according to the laws of the State of New York." *Id.* at 31. The defendant argued that the clause barred the plaintiff's Massachusetts Chapter 93A claim because the statutory claim related to the contractual relationship between the parties. The First Circuit rejected that argument and held that the narrow choice-of-law provision did not govern independent statutory claims because the clause merely governed construction of the agreement itself and did not broadly provide that all disputes or all rights and obligations between the parties would be governed exclusively by New York law.

Further, the First Circuit explained that where a clause states only that the agreement itself shall be "governed by and construed" under a particular state's law, the provision does not extend to independent statutory claims arising from deceptive conduct occurring outside the contract. *Kleiner*, 66 F.4th at 31–33. The court emphasized that such a clause "does not otherwise select any

state's law as governing the parties' rights and obligations that are created by statute" and does not mandate "that all disputes be resolved according to" the selected state's law. *Id.* at 32.

The contractual language here is materially indistinguishable from the narrow clause analyzed in *Kleiner*. The Purchase Agreement provides only that it "shall be governed by and construed in accordance with" Massachusetts law. The Agreement does not state that all disputes, all statutory claims, or all rights and obligations between the parties are governed exclusively by Massachusetts law. Nor does the Agreement purport to waive statutory remedies arising under Florida law.

BTL's own authorities confirm the point. In *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607 (1st Cir. 1993), the clause selected California law to govern "the rights and obligations of the parties" under the agreement, and the court held that bad-motive allegations did not take the claims outside that language. Def.'s Mem. at 7. BTL's clause contains no comparable "rights and obligations" language; it provides only that "[t]his Agreement shall be governed by and construed in accordance with" Massachusetts law. SAC Ex. A at 3; *see Kleiner*, 66 F.4th at 31 (distinguishing *Northeast Data* on this ground). *ePresence, Inc. v. Evolve Software, Inc.*, 190 F. Supp. 2d 159 (D. Mass. 2002), is distinguishable twice over. The clause there reached "this Agreement and all matters arising out of or relating to this Agreement," *id.* at 162, and the c. 93A claim's gravamen was breach of the contract itself, id. at 164–65, not deception that induced the plaintiff to enter it.

*Kleiner* did not break new ground. It applied *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 646 N.E.2d 741, 746 n.9 (1995), and followed V*ertex Surgical, Inc. v. Paradigm Biodevices, Inc.*, 390 F. App'x 1, 3 & n.3 (1st Cir. 2010), in which a Massachusetts choice-of-law clause likewise did not displace a claim under another state's statute. *See Kleiner*, 66 F.4th at 31–

32. BTL's reading would also leave Florida purchasers with no statutory remedy at all. A Massachusetts choice-of-law clause does not satisfy c. 93A, § 11's requirement that the conduct occur "primarily and substantially within the commonwealth," and another session of this Court has so held as to BTL's own sales contracts. *Mark Breiner DDS, LLC v. BTL Indus., Inc.*, No. 24-cv-12413-FDS, 2026 U.S. Dist. LEXIS 8067, at *10–12 (D. Mass. Jan. 15, 2026) (citing *Plastic Surgery Assocs., S.C. v. Cynosure, Inc.*, 407 F. Supp. 3d 59, 78–80 (D. Mass. 2019)). Nothing in a clause that says only how "this Agreement" is to be construed suggests the parties meant to waive both states' unfair-practices statutes.

Count I seeks redress for deceptive representations that preceded contract formation and induced Plaintiffs to enter the transaction, including misrepresentations of provider profitability, market saturation, and financing exposure. SAC ¶¶ 12–19, 26–36, 40–44, 51–57. Those claims arise from statutory duties imposed by FDUTPA, not from duties created by the Purchase Agreement, and the Agreement's limited choice-of-law clause does not displace them. Massachusetts has adopted a "functional choice-of-law approach," which focuses on "the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.,* 393 Mass. 622, 631 (1985). Because the clause does not reach Plaintiffs' statutory claim, the Court applies that approach as it would absent a contractual choice, asking which state has "the most significant relationship to the transaction and the parties." *Id.* at 632. Plaintiffs' FDUTPA claim arises from deceptive and unfair conduct occurring primarily in Florida and directed toward Florida residents and businesses. SAC ¶¶ 4-5, 11, 17-20. BTL solicited Dr. Ellman because of his established Boca Raton practice, and the equipment was purchased by Florida residents for use in Florida. *Id.* Florida therefore has a substantial interest in regulating deceptive conduct directed toward Florida consumers and businesses.

BTL's characterization of Plaintiffs as "sophisticated businesspeople" does not warrant dismissal of Count I. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 27, at 7. FDUTPA does not limit its protections to unsophisticated consumers. Rather, FDUTPA defines a “consumer” to include businesses and business entities, Fla. Stat. § 501.203(7), and prohibits unfair methods of competition and deceptive acts or practices in trade or commerce regardless of whether the claimant is an individual consumer, a professional, or a business entity. Plaintiffs' status as a physician and medical practice therefore does not preclude relief under FDUTPA.

## II. Plaintiffs Sufficiently Allege Violations of the Sherman Act.

### *A. Defendant Improperly Seeks to Adjudicate Fact-Intensive Issues on a Motion to Dismiss.*

BTL’s Sherman Act arguments improperly hold the SAC to an evidentiary burden. BTL faults Plaintiffs for failing to prove market definition, market power, and anticompetitive effects, but those are fact-intensive questions that await discovery and expert analysis, not pleading requirements under Rule 12(b)(6).

Several of BTL’s authorities were decided on a developed factual record. For example, Defendant cites *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011), for the proposition that the absence of antitrust injury defeats standing. Def’s Mem. at 8. However, in *Sterling*, the issue before the First Circuit was not whether a motion to dismiss was properly granted, but whether a motion for summary judgment was properly granted. Plaintiffs would have the burden to make such showings at the summary judgment stage, but not at this time; not at the pleading stage.

Further, even where Defendant cites cases decided at the motion to dismiss stage, it mischaracterizes those decisions in an effort to impose a heightened pleading burden. For example, Defendant relies on *Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286 (1st Cir. 2022) to argue

that Plaintiffs must allege facts showing that BTL plausibly "exercises or could exercise a threshold degree of market power." However, Defendant selectively quotes the decision and omits critical context. The court in *Vazquez-Ramos* explained that, because the claims were analyzed under the rule of reason, plaintiffs would ultimately be required to provide "proof that defendants exercise or could exercise a threshold degree of market power," and "must in due course adduce enough evidence to permit a reasonable factfinder to define the relevant market." *Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th at 296. Crucially, however, the court expressly distinguished that evidentiary burden from the pleading-stage standard, stating: "Here, by contrast, we stand at the pleading threshold, with a record yet to be fleshed out with evidence and expert opinions. We therefore ask only whether the amended complaint alleges facts that plausibly delineate a relevant market." *Id.* at 297. Applying that standard, the First Circuit held the market plausibly alleged and reversed the dismissal in part. *Id*. at 297–98. Thus, *Vazquez-Ramos* confirms that Plaintiffs are not required at this stage to prove market power or definitively establish a relevant market—only to plausibly allege one, which the SAC does. *See* SAC ¶¶ 75, 81–82.

Moreover, the SAC pleads a cognizable single-brand aftermarket. Under *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 473–78, 481–82 (1992), a manufacturer may possess market power in the aftermarket for its own products where purchasers are locked in by high switching costs and could not have accounted for the restraints at the time of purchase. That is what the SAC alleges. Providers must regularly purchase applicators and consumables that only BTL supplies (SAC ¶ 30). They are locked in by equipment investments that routinely exceed $500,000.00 (¶ 28), an undisclosed approximately $100,000.00 recertification/transfer fee (¶¶ 31, 40), and a perpetual security interest (¶¶ 32, 42). BTL then uses its control over those consumables to enforce its price restraint, doubling applicator costs and delisting non-compliant providers (¶¶

30, 39, 41). Because the transfer fee was undisclosed, Plaintiffs could not price these lock-in costs into the purchase decision, which is the information gap on which Kodak turns. BTL's reliance on *Illinois Tool Works Inc. v. Independent Ink, Inc*., 547 U.S. 28, 45–46 (2006), is therefore misplaced: that case holds only that a patent does not by itself establish market power, and Plaintiffs' market-power allegations do not rest on the patent alone.

***B. Plaintiffs Plausibly Allege Antitrust Injury and Standing.***

Defendant argues that Plaintiffs fail to allege any harm caused by Defendant's purportedly anticompetitive conduct. That argument is incorrect and ignores the well-pleaded factual allegations of the SAC, which plainly set forth both antitrust injury and standing. *See, e.g.,* SAC ¶¶ 26-33, 38-43, 52-61, 77-83.

"The purpose of the antitrust standing doctrine is to avoid overdeterrence and to ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." V*azquez-Ramos*, 55 F.4th at 293. Courts therefore "seek to ensure that the prospective antitrust plaintiff has suffered an injury of the kind antitrust laws were intended to prevent, such that the plaintiff is a proper party" to sue. *Id.* Antitrust standing is assessed under a multi-factor test drawn from Supreme Court precedent, *see Sterling Merch*., 656 F.3d at 120–21, and courts "consider the balance of factors in each case." *MJ's Mkt., Inc. v. Jushi Holdings, Inc.*, 766 F. Supp. 3d 197, 210 (D. Mass. 2025) (quoting *Sullivan v. Tagliabue*, 25 F.3d 43, 46 (1st Cir. 1994)). The factors include: (1) the causal connection between the violation and the harm; (2) improper motive; (3) the nature of the injury (i.e., antitrust injury); (4) the directness of the injury; (5) the speculative nature of damages; and (6) the risk of duplicative recovery." *See id.; Vazquez-Ramos*, 55 F.4th at 293.

Here, the SAC plausibly alleges facts satisfying each factor. First, there is a direct causal connection between Defendant's conduct and Plaintiffs' harm. Plaintiffs allege that Defendant sells its Emsculpt NEO® devices by misrepresenting that providers, like Plaintiffs, will be able to profitably offer services at approximately $850 per session. SAC ¶ 76. After inducing providers to enter the market and invest substantial sums in Defendant's equipment, Defendant oversaturates the market by flooding the market with the same RPM-governed equipment. SAC ¶¶ 44, 51. At the same time, Defendant requires, and coercively enforces, that providers not advertise services at $850 per session. SAC ¶¶ 26-30, 39-41.

Second, Plaintiffs allege improper motive as Defendant's conduct is designed to artificially inflate prices while maintaining control over the downstream market for services using its proprietary equipment. By oversaturating the market and simultaneously restricting price competition, Defendant creates a system in which providers cannot compete on price or sustain profitability. SAC ¶¶ 36, 43, 48-51, 59.

Third, Plaintiffs allege a classic antitrust injury. "The Supreme Court has defined antitrust injury as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' In other words, the alleged injury must be the type of injury the antitrust violation would cause to competition." *Vazquez-Ramos*, 55 F.4th at 294. Plaintiffs' allegations satisfy this standard. Defendant's conduct—oversaturating the market while imposing and enforcing an artificial price floor—distorts the competitive process. As there is insufficient consumer demand at the mandated advertised price point, providers like Plaintiffs are unable to compete effectively, suffer lost customers and revenue, and face the risk of being forced out of business entirely. SAC ¶¶ 56-61. Defendant further exacerbates this harm through coercive enforcement mechanisms that increase costs and limit Plaintiffs' ability to adapt to market

conditions. SAC ¶¶ 30, 39-41. This is not merely harm to an individual competitor; it is harm to competition itself. Defendant's alleged scheme results in fewer providers remaining in the market, reducing output and artificially inflated prices for consumers. Such allegations fall squarely within the type of injury the antitrust laws are designed to prevent.

BTL's contrary arguments fail. First, BTL contends that by alleging BTL "flood[ed] the market," Plaintiffs allege more competition, not less. Def.'s Mem. at 9. But the restraint operates on price competition among providers of the identical BTL-branded service. Adding providers who are all forbidden to advertise below the same floor does not add price competition; it only multiplies the number of sellers bound by the restraint. Second, BTL argues that the SAC's allegation that there is little market even at secondary-market prices (SAC ¶ 82) severs causation. Def.'s Mem. at 9. Read with ¶¶ 40–43, the allegation is that BTL allows unrestrained secondary-market owners to undercut MAP-bound providers, who cannot respond on price without losing their consumables discount and directory listing. Plaintiffs' injury thus flows directly from the asymmetric application of the price restraint, which is what makes the conduct anticompetitive.

The remaining factors also favor standing. Plaintiffs' injuries are direct, and their damages, including lost profits and increased costs, are calculable rather than speculative.

### *C. Plaintiffs Adequately Allege an Agreement Under Section 1 of the Sherman Act.*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Here, Plaintiffs explicitly allege that Defendant entered into agreements with Plaintiffs and other providers in connection with (1) the purchase of BTL equipment and (2) participation in Defendant's MAP program. SAC ¶¶ 26–30, 77–78 & Ex. A at 3. Defendant's assertion that the SAC alleges only unilateral conduct disregards these allegations entirely. Plaintiffs do not merely allege that

Defendant announced pricing policies; rather, they allege that Defendant entered into contractual relationships that required adherence to those policies and conditioned continued participation in the market on compliance.

BTL's reliance on *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), and *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984), is misplaced. Those cases protect a manufacturer that "announce[s] in advance the circumstances under which he will refuse to sell" and then acts "independently." *Colgate*, 250 U.S. at 307; *Monsanto*, 465 U.S. at 761. They do not apply where the manufacturer and its customer commit to the price term in a signed contract. A § 1 agreement requires only "a conscious commitment to a common scheme," *Monsanto*, 465 U.S. at 764 (citation omitted), and nothing is more conscious than a written term both parties execute. The MAP provision appears in the Terms and Conditions of Sale that Dr. Ellman signed (SAC Ex. A at 3). BTL itself describes the MAP terms as "clearly stated in the contract." Def.'s Mem. at 11 (quoting Breiner). Whether that express vertical agreement unreasonably restrains trade is a rule-of-reason question under *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885, 907 (2007). It is not grounds for dismissal.

In *Simpson v. Union Oil Co. of California*, 377 U.S. 13 (1964), the Supreme Court held that a dealer could bring a Section 1 claim challenging a pricing scheme even though it had entered into the agreement and participated in it. The Court emphasized that coercively imposed agreements that restrain trade remain subject to antitrust scrutiny. Id. Similarly, here, Plaintiffs allege that they and other providers were induced into entering agreements that impose a minimum advertised price with Defendant as a condition of doing business. SAC ¶¶ 26–27. Just as in *Simpson*, these agreements are not optional in any meaningful sense. Although BTL styles the MAP clause as conditioning "benefits" on participation, the benefits withdrawn for non-

compliance are the means of operating the equipment profitably at all: inclusion in BTL's provider directory, warranty coverage valued at $15,000 per year, and a 50% discount on applicators that otherwise cost $30,000 per pair. SAC ¶¶ 27, 30, 39–41; Ex. A at 3. Whatever label BTL attaches to it, a term that strips a provider of the means of operating the equipment profitably unless it adheres to BTL's price floor is the kind of pressure Simpson treated as coercive. Another session of this Court has already allowed a materially identical Sherman Act § 1 claim challenging BTL's MAP program to proceed. In *Breiner*, the court granted leave to add the claim because it was "not obviously futile at the pleading stage," holding that "an adjudication of the merits of the claim will await the development of a more complete factual record." 2026 U.S. Dist. LEXIS 8067, at *42. The same result is warranted here.

### ***D. Plaintiffs Sufficiently Allege Improper Maintenance of Monopoly Power Under Section 2 of the Sherman Act.***

Defendant's Motion should also be denied because the SAC plausibly alleges a violation of Section 2 of the Sherman Act. To state a claim under Section 2, a plaintiff must allege that "(1) that the defendant possesses 'monopoly power in the relevant market,' and (2) that the defendant has acquired or maintained that power by improper means." *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 7 (1st Cir. 2020) (quoting *Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990)).

Here, Plaintiffs plausibly allege that Defendant has monopoly power as they allege that "BTL is the only manufacturer of these particular types of machines as it holds the only patents on the specific type of technology used in these machines." SAC ¶¶ 75, 81. Further, Plaintiffs plausibly allege that Defendant maintains its monopoly power by attempting to retain control over its equipment after sale by imposing contractual restrictions that prevent resale or transfer and by maintaining a perpetual security interest in the equipment. SAC ¶¶ 31–32, 40, 42. Such conduct is

not the lawful exercise of patent rights but an attempt to extend control beyond the initial sale and foreclose secondary markets. *See Impression Products, Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 370, 137 S. Ct. 1523, 198 L. Ed. 2d 1 (2017) ("A patentee is free to set the price and negotiate contracts with purchasers, but may not, by virtue of his patent, control the use or disposition of the product after ownership passes to the purchaser. The sale terminates all patent rights to that item."). These restrictions deter providers from reselling their equipment and exiting the market, lock them into continued purchases of BTL consumables, and raise barriers to exit. SAC ¶¶ 40, 42. Defendant thereby maintains its control over the aftermarket for the consumables and services on which providers depend, insulating itself from competitive pressure.

## III. Plaintiffs Plead Fraud with the Required Particularity (Count IV).

The SAC satisfies Rule 9(b). It identifies the speaker (BTL representative Kris Huston), the date and occasion (the March 2, 2023, meeting), each of the eighteen specific statements made, the transaction they induced, and the resulting losses. SAC ¶¶ 17–25, 85–92. That is more than Rule 9(b) required in *Breiner*, where the court accepted fraud allegations that did not name the BTL speakers because they identified a single meeting on a single date. *Breiner*, 2026 U.S. Dist. LEXIS 8067, at *23–25. BTL does not contend otherwise; it argues instead that each statement is non-actionable as a matter of law. Two sessions of this Court have rejected that argument as to materially similar BTL sales statements. Id. at *25–28, *42–45; *AIM Grp., LLC v. BTL Indus., Inc.*, No. 1:26-cv-12129-AK, 2026 U.S. Dist. LEXIS 223710, at *7–9 (D. Mass. Sept. 30, 2026).

BTL's attempt to dismiss Count IV fails because it disregards both the well-pleaded allegations of the SAC and controlling decisions addressing materially identical sales practices. Def.'s Mem. at 15. To state a claim for fraud under Massachusetts law, a plaintiff must allege a false representation of a material fact, knowledge of its falsity, intent to induce reliance, actual and

reasonable reliance, and resulting damages The SAC alleges each element in detail. *Koufakis v. Schatz*, 28 LCR 583, 585 (Mass. Land Ct. 2020); *see also Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 472 (2009).

As to falsity, BTL representative Kris Huston represented during the March 2, 2023, sales presentation that Dr. Ellman would earn $1,000.00 per Emsculpt NEO® treatment and $400.00 per Emsella® treatment, would break even with only two treatments per month on each device, would receive the benefits of Ambassador Site exclusivity in a severely limited geographic market, and would acquire the equipment through a risk-free transaction that permitted return or resale without meaningful restriction. SAC ¶¶ 17-25, 85(a), (g), (i), (k)-(n), (p).

To the extent BTL challenges scienter, the SAC alleges that BTL knew these representations were false because it possessed proprietary information concerning the actual market for its devices, controlled minimum treatment pricing through its RPM policies, knew providers routinely failed to achieve the represented revenues, and knew of the substantial costs and restrictions associated with resale and transfer. *Id.* ¶¶ 26-36, 40, 43, 49-51. Massachusetts law does not permit a defendant to avoid liability by professing ignorance of facts that were readily ascertainable and within its control. Where a defendant represents ascertainable facts as true, liability may attach even absent proof of actual knowledge of falsity. *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22-23 (1st Cir. 2001); *Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 78 (1991). Given BTL's alleged control over pricing, provider data, and the market for its proprietary devices, the SAC easily satisfies that standard.

As to inducement, the statements were made during a sales presentation for the express purpose of persuading Dr. Ellman to execute the Purchase Agreement and financing documents presented at that meeting. SAC ¶¶ 18-19. *See Eureka Broadband Corp. v. Wentworth Leasing*

*Corp*., 400 F.3d 62, 69 (1st Cir. 2005) (fraud requires a representation made to induce the plaintiff to act).

As to reliance, Dr. Ellman alleges that he entered into the transaction in reliance on BTL's representations and superior knowledge of the body-contouring market, a market in which he lacked experience. SAC ¶¶ 12, 18-19, 36, 89-91*; see Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 16-17 (1st Cir. 2004) (reasonable reliance is ordinarily a question of fact); *AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc*., 928 F.3d 110, 122 (1st Cir. 2019) (reliance established where the plaintiff acts on the representation to its detriment); *AIM Grp., LLC v. BTL Indus., Inc.,* 2026 U.S. Dist. LEXIS 223710, at *13-14 (D. Mass. Sept. 30, 2026) (finding reliance adequately pleaded where BTL possessed superior knowledge concerning the body-contouring market).

As to damages, Plaintiffs allege they incurred substantial financing obligations, operating expenses, marketing expenditures, and related losses because the profitability represented by BTL was rendered unattainable by facts BTL concealed from the outset. Those concealed facts included BTL's knowledge that little or no market existed for treatments at its RPM-mandated pricing, that providers routinely failed to achieve the revenues and patient demand represented during the sales presentation, that resale opportunities were severely restricted, and that any attempted transfer of the equipment would be burdened by approximately $100,000 in recertification and transfer fees. SAC ¶¶ 26-36, 31, 40, 43, 49-51, 92. Plaintiffs' losses flowed directly from those undisclosed conditions, which prevented the devices from generating the revenues promised and significantly impaired Plaintiffs' ability to exit the transaction once the true market conditions became apparent. *See Reisman v. KPMG Peat Marwick* LLP, 57 Mass. App. Ct. 100, 112 (2003) (damages sufficiently alleged where the loss was the direct, natural, and foreseeable result of the

misrepresentation); *Eureka Broadband,* 400 F.3d at 69 (finding detrimental reliance where the plaintiff incurred transaction-related financial obligations it otherwise would not have undertaken).

Although BTL correctly recites the elements of fraud, it largely ignores the SAC's allegations satisfying them. Defendant's Motion devotes little attention to scienter, inducement, reliance, or damages and instead focuses almost exclusively on whether certain statements can be characterized as non-actionable. Nor does BTL meaningfully address Plaintiffs' omission theory, including the undisclosed recertification and transfer fees and other material facts omitted from BTL's sales presentation. Id. ¶¶ 31, 40, 92.

***A. BTL's Specific, Numerical Representations Are Actionable Statements of Present Fact.***

Statements that convey "specific, numerical representations of present, rather than future, facts that could be shown to be false" are actionable. *AIM Grp*., 2026 U.S. Dist. LEXIS 223710, at *8 (sustaining statements that Emsculpt "brings in 51% more new patients" and that providers pay off the equipment "within a year or less"). *Breiner* sustained the same kind of statements: that Emsculpt purchases "have an average payoff of four to five months," that BTL equipment "gets $4500 per treatment session," that no other BTL provider was within 26 miles, and that the financing interest rate would be 6.8%. 2026 U.S. Dist. LEXIS 8067, at *27–28, *42–45. The SAC alleges statements of exactly that character. BTL represented that Dr. Ellman "would get $1000 per treatment with the Emsculpt NEO®" and "$400 per treatment with the Emsella®" (SAC ¶ 85(k)–(l)); that he would break even each month on two sessions of each device (¶ 85(g), (p)); that there would be only six Ambassador sites in the Southeast, two of them in Florida (¶ 85(a), (i)); and that he was leasing, not purchasing and financing, the equipment, with no interest and a penalty-free return (¶¶ 85(m)–(n), 89–91). Each could be shown false, and the SAC alleges each

was. SAC ¶¶ 18–19, 23, 36, 43, 49–51. BTL never addresses ¶ 85(k) at all, and BTL's own success manager later told Dr. Ellman the device would bring $850 per treatment, not $1,000. SAC ¶ 23.

BTL likewise ignores the SAC's omission theory. The Purchase Agreement nowhere discloses the approximately $100,000 recertification/transfer fee that BTL imposes on any resale (SAC ¶¶ 31, 40), and BTL, having chosen to speak about the risk-free nature of the investment, was obliged to disclose it. SAC ¶ 92. One who speaks "is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge," because "half-truths may be as actionable as whole lies." *Kannavos v. Annino*, 356 Mass. 42, 48 (1969). Because the omission theory is unchallenged, Count IV survives regardless of how the Court rules on BTL's categories.

***B. The Contract Does Not Bar Reliance on BTL's Representations.***

BTL argues that the warranty disclaimer and "Entire Agreement" clause make reliance unreasonable as a matter of law. Def.'s Mem. at 16. BTL's own authority forecloses that argument as to fraud. "Whether we refer to the clause in question as a merger clause, an integration clause, or an exculpatory clause, the settled rule of law is that a contracting party cannot rely upon such a clause as protection against claims based upon fraud or deceit." *Sound Techniques, Inc. v. Hoffman*, 50 Mass. App. Ct. 425, 429 (2000); accord *Bates v. Southgate*, 308 Mass. 170, 182–83 (1941). The language BTL quotes from Sound Techniques comes from the court's analysis of a negligent misrepresentation claim, and it turned on an express clause in which the tenant acknowledged it had not relied on any representations outside the lease. 50 Mass. App. Ct. at 427, 433–34. BTL's agreement has no non-reliance clause. The capitalized text BTL quotes is a warranty disclaimer, and the "Entire Agreement" clause says only that no other "terms and conditions" apply. SAC Ex. A at 2–3.

Nor does the rule that a party to a "fully negotiated" contract may not claim fraud based on an oral assertion inconsistent with a contract term that "specifically addressed the particular point at issue" apply here. *Masingill v. EMC Corp.*, 449 Mass. 532, 870 N.E.2d 81, 89 (2007). The SAC alleges that BTL's representative presented "boilerplate" finance agreements at the same meeting, and that those agreements state no interest rate at all. SAC ¶¶ 18–19. A document that is silent on the point cannot contradict the representation. And reliance is not unreasonable merely because a buyer could have uncovered the truth by examining documents more closely. *Kannavos*, 356 Mass. at 49–50. Where, as here, the seller has superior knowledge of the matters represented, the buyer is entitled to rely on what it says. *See AIM Grp.*, 2026 U.S. Dist. LEXIS 223710, at *13–14 (finding reliance adequately pleaded against BTL on that basis). Whether Dr. Ellman's reliance was reasonable, given BTL's superior knowledge and his lack of experience in the body-contouring market (SAC ¶¶ 12, 36), is a question of fact that cannot be resolved on a motion to dismiss.

***C. BTL's Projections Are Actionable Because BTL Knew Facts That Made Them False.***

Statements framed as predictions or opinions are actionable where the speaker "is understood to have special knowledge of facts unknown to the recipient" and the statement implies that facts exist to justify it. *McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass. App. Ct. 573, 575–76 (1995) (citing *Briggs v. Carol Cars, Inc*., 407 Mass. 391, 396 (1990)). The SAC alleges that BTL knew that "no such market exists" and that "virtually none of [its] retailers were able to sell the services for the minimum-RPM of $850 per session or even $200 per session." SAC ¶ 36; *see also* ¶¶ 43, 49–51. Judge Kelley rejected BTL's scienter argument on materially similar allegations, where the complaint alleged that BTL "exercises substantial control over the market size by setting the RPM-mandated minimum price for treatments," reasoning that "as a company engaged in selling proprietary products, BTL would have knowledge of the market size of its equipment."

*AIM Grp.*, 2026 U.S. Dist. LEXIS 223710, at *12. The SAC alleges the same control. SAC ¶¶ 26–30, 36. Against that knowledge, BTL's representations about what Dr. Ellman would earn per treatment and how quickly he would break even were not innocent optimism.

***D. Breiner and AIM Group Confirm That Count IV States A Claim.***

BTL relies on Breiner, but by BTL's own account Judge Saylor dismissed only some of the challenged statements. Def.'s Mem. at 2–3, 12. He sustained the fraud claim as to thirteen statements, including the payoff, per-session price, competitor-radius, and interest-rate statements most like those alleged here, and held that the claim was not time-barred because the fraud was not plausibly discoverable on the date of the sales meeting. *Breiner*, 2026 U.S. Dist. LEXIS 8067, at *23, *27–28, *45. Judge Kelley then sustained a fraud claim against BTL based on a materially similar sales pitch. *AIM Grp.*, 2026 U.S. Dist. LEXIS 223710, at *8–9, *14. At most, these decisions support narrowing Count IV, not dismissing it.

**IV. In the Alternative, Plaintiffs Request Leave to Amend.**

Should the Court find any count deficient, Plaintiffs respectfully request leave to amend. Leave should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted," and the Court applies "the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion." *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). Plaintiffs would supplement their allegations regarding the circumstances of the March 2, 2023 meeting, the falsity of the challenged representations, and the single-brand aftermarket described above.

## CONCLUSION

The SAC plausibly alleges deceptive conduct, fraudulent inducement, an unlawful vertical price restraint, monopoly maintenance, antitrust injury, and resulting damages. BTL's factual and economic disputes cannot be resolved without discovery. Plaintiffs respectfully request that the Court deny the Motion in its entirety and require Defendant to answer the Second Amended Complaint or, in the alternative, grant Plaintiffs leave to amend.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiffs join in Defendant's request that the Court hear oral argument on the Motion and respectfully submit that argument will assist the Court.

Dated: October 22, 2026

Respectfully submitted,

/s/ *Gary N. Mansfield, Esq.*
**GARY N. MANSFIELD, ESQ.**
**FBN: 61913**
**DAVID STONE, ESQ.**
**FBN: 400432**

***Admitted pro hac vice***

MANSFIELD BRONSTEIN & STONE, LLP
200 E. Broward Boulevard
Suite 1250
Ft. Lauderdale, Florida 33301
Phone: (954) 601-5600
Service Email Designation:
litigation@mblawpa.com

MARIAN A. KORNILOWICZ (BBO# 277680)
COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN, P.C.
1600 Market St.
32nd Floor
Philadelphia, PA 19103
mak@cohenseglias.com

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the Court's electronic filing notification system upon all parties registered to receive electronic notice in this case on this 22nd day of October 2026.

/s/ *Gary Mansfield, Esq.*
**GARY MANSFIELD, ESQ.**